NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

---

CARLOS M. ROQUE,

     Plaintiff,

        v.

COMMISSIONER OF SOCIAL
SECURITY,

     Defendant.

Civil No. 14-02681 (RMB)

**OPINION**

---

**APPEARANCES:**
Alan H. Polonsky
Polonsky and Polonsky
512 S White Horse Pike
Audubon, NJ  08106
     Attorney for Plaintiff

Paul J. Fishman
Elizabeth Ann Corritore
c/o Social Security Administration
Office of the General Counsel
300 Spring Garden Street
6th Floor
Philadelphia, PA  19123
     Attorneys for Defendant

**BUMB,** UNITED STATES DISTRICT JUDGE:

     Plaintiff Carlos M. Roque (the "Plaintiff") seeks judicial

review pursuant to 42 U.S.C. §§ 405(g) of the final decision of

the Commissioner of Social Security (the "Commissioner") denying

his application for social security benefits. For the reasons

set forth below, the Court vacates the ALJ's decision and remands for further proceedings consistent with this Opinion.

I.   **Background**

   a. **Procedural Background**

Plaintiff applied for a period of disability and disability insurance benefits on January 3, 2011, alleging a disability onset date of October 10, 2009 (the "alleged disability onset date"). (Administrative Record "R" 29.) The claim was denied on May 11, 2011, and again on reconsideration on February 3, 2012. (Id.) Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), and a hearing was held before the Honorable Nicholas Cerulli on December 12, 2012. (Id.) Plaintiff testified at the hearing and was represented by counsel. (Id.)

On January 11, 2013, the ALJ issued a decision finding that Plaintiff has not been under a disability from the alleged disability onset date, October 10, 2009, through the date of decision and denying Plaintiff's application. (Id. at 29-37.) Plaintiff timely filed an appeal, and submitted two additional reports for consideration, an initial examination report dated September 12, 2013 and a nerve conduction study dated September 30, 2013. The Appeals Council denied the appeal on April 4, 2014, noting that the new evidence related to a later time and did not affect the ALJ's decision. (See id. at 1-4.) At that

time, the ALJ's decision became the final decision of the Commissioner.

### b. Factual Background

Plaintiff was 48 years old, which is defined as a "younger person" under the regulations, 20 C.F.R. § 404.1563, on the alleged disability onset date. (R. 35.) However, he subsequently changed age category to "closely approaching advanced age" when he turned 50. (Id. at 36.) Plaintiff resides with his 80 year old mother and 45 year old brother. (Id. at 51.) He previously worked as a warehouse coordinator, working in the office and on the shipping dock to check orders and sometimes loading trailers. (Id. at 59.) The office work Plaintiff performed while a warehouse coordinator involved mostly sitting or standing to retrieve files that were five pounds or less. (Id. at 63.) In June 2008, Plaintiff was in a motor vehicle accident in which he injured his back. Upon his return to work, he was placed on light duty and stopped assisting with loading the trucks. (See id. at 81-82.) Although Plaintiff previously indicated that he ceased working on October 10, 2009, the alleged disability onset date, "because of [his] condition(s)" (id. at 226),[1] Plaintiff

---

[1] See also id. at 57 ("Q. . . . Mr. Roque, it's my understanding that you alleged that your disability began on October 10th of 2009 . . . . Why is that the day that you allege that your disability began? A. Because since I had my accident

3

later testified that he was laid off on that date because his
employer decided to move its warehouse out-of-state (id. at 59-
60.)

In Plaintiff's Adult Function Report completed on March 7,
2011, Plaintiff reported that he must be careful when completing
personal care activities, such as dressing and bathing because
it can be painful if he "twists the wrong way." (Id. at 207.) He
also prepares his own meals daily, and reported that he could
iron, do laundry, and clean once a week but that his conditions
required him to take more time completing these tasks. (See id.
at 208.) Plaintiff goes outside every day, is able to drive a
vehicle without assistance, pay bills, go shopping, and attend
church. (See id. at 209-10.) He can lift approximately ten
pounds and walk for about 30 minutes before resting. (Id. at
211.) He also notes that he can pay attention for only 30
minutes and does not finish what he starts, but he is able to
follow instructions well. (Id.)

**c. Medical Evidence**

As noted above, Plaintiff was involved in a motor vehicle
accident in June 2008. (R. 284.) A September 2008 cervical spine
MRI suggested "small" central disc herniations at C4-5, C5-6,

---

in 2008, as the days went by, [the pain and limitations] just
getting [sic] worse, and worse, and worse.").

and C6-7 causing compression upon the thecal sac but no evidence of signal abnormality arising from the spinal cord. (Id. at 461.) Then, an October 2008 lumbar spine MRI revealed a central disc herniation at L4-L5 S1, causing epidural compression but no impingement of the thecal sac or nerve roots, as well as "mild" foraminal stenosis at L4-L5 secondary to a bulging disc. (Id. at 460.) EMGs conducted in February and November 2008 suggested a right L4 and L5 radiculopathy. (Id. at 323, 462-63.)

Between June 2008 and February 2009, Plaintiff received treatment from Adam Benn, a chiropractor, for neck and low back pain. (Id. at 464-516.) Throughout this time, Dr. Benn's treatment notes consistently reflect that Plaintiff expressed a decrease in symptoms and increase in activities of daily living after treatment. (See, e.g., id. at 503-10.) Plaintiff does not appear to have sought chiropractic treatment from March 2009 up until the alleged disability onset date, October 10, 2009. Indeed, Plaintiff did not return to chiropractic treatment until shortly after a second motor vehicle accident that occurred in October 2012 – more than three years after the alleged disability onset date.

Between December 2008 and June 2010, Plaintiff also visited the Center for Pain Management for shoulder, neck, back, and lower extremity pain, where he underwent trigger point and facet joint injections, electrical stimulation, and fluoromethane

5

spray. (Id. at 289-369.) Again, throughout this time, Plaintiff reported improvement in his ability to engage in daily activities as well as his functional mobility.[2] On October 20, 2009, just a few days after the alleged disability onset date, Plaintiff reported that his "[l]ow back pain is much better" and his "[s]pasm and stiffness are decreasing." (Id. at 315.) He subsequently received a lumbar epidural injection and, during a follow-up on November 3, 2009, Plaintiff reported "some" neck and low back pain "but not as bad as it was." (Id. at 311.) On November 9, 2009, Plaintiff described low back pain with a pain level of 6/10, but no radiating pain for a month and only "occasional" numbness and tingling. (Id. at 309.) With some exceptions, Plaintiff continued to report improvement in activities, spasm, stiffness, and pain levels. (See, e.g., id. at 292, 296.) On June 18, 2010, surgery was recommended, but Plaintiff declined. (Id. at 289.) Alternative treatments were discussed, but Plaintiff elected to be discharged. (Id.)

---

[2] See id. at 362 ("Patient has a 30% improvement after initial treatment"), 360 ("noting a decrease in neck and back pain" with less spasm), 358 ("Patient has a 35% improvement with a decrease in spasm and pain" as well as improved activities and range of motion), 356 (noting less pain and spasm, fewer flare-ups, and improved mobility), 354 ("Patient has a 50% improvement from last treatment. Patient has been noting some 'good days' and his activities of daily living and mobility are improved."), 352 (noting "significant decrease" of neck pain, improved low back pain, and "better mobility"), 350 (noting 60% improvement).

In January 2010, Plaintiff was referred to Dr. Mohsin S. Sheikh for continuation of epidural injections. (Id. at 388.) During an initial examination, Plaintiff rated his pain level as 7/10, and described it as throbbing and aching associated with numbness and tingling down his legs. Yet, Plaintiff reported "being independent with activities of daily living as well as ambulation without the use of an assisted device." (Id. at 389.) Dr. Sheikh recorded only a "somewhat reduced range of motion" with some tenderness, but negative Patrick's maneuver, Hoffman's test, and straight leg raise examination. He also observed that motor examination is 5/5 in bilateral upper extremities and 4/5 in bilateral lower extremities. (Id. at 390.) Dr. Sheikh suspected lumbar spondylosis, lumbar disc disease at L4-L5 and LB-S1, possible bilateral lumbar radiculopathy, and lumbar facetogenic pain. He recommended an MRI, physical and aquatic therapy, and lumbar epidural steroid injections. (Id.) Despite these recommendations, Plaintiff did not pursue aquatic therapy or physical therapy at that time.

Plaintiff received injections from Dr. Sheikh from February through May 2010. (See id. 378-79, 382, 385.) During his visits, Dr. Sheikh recorded Plaintiff's complaints of pain intensity of 6-8/10, but also noted Plaintiff's normal gait and significant response to treatment. (See, e.g., id. at 375 (60% response), 377 (50% response).)

7

During the relevant period, Plaintiff also treated with Dr. Robert Ocasio for Plaintiff's high blood pressure, asthma, and allergies. (See id. at 418, 426.) Just before the alleged disability onset date, on October 8, 2009, Dr. Ocasio determined that Plaintiff had a normal gait, his hypertension was "much better," and his asthma and allergies were stable. (See id. at 426-27.) Later, in April 2010, Dr. Ocasio recorded normal gait, muscle tone, and bulk with intact power. (See id. at 418.)

Plaintiff also treated with Dr. Philip Whiting beginning in November 2010 for his blood pressure. (See id. at 442.) The November 2010 treatment notes make no mention of Plaintiff's back pain. Several months later, during a May 2011 appointment, Plaintiff complained of lumbosacral pain radiating into both legs due to a motor vehicle accident two years prior. (Id. at 440.) Plaintiff reported that he had failed injections and physical therapy, and refused surgery. He also complained of insomnia and anxiety, which Dr. Whiting treated with hydrocodone and zolpidem. (Id.)

Around this time, Plaintiff underwent two consultative exams. On April 28, 2011, Plaintiff met with Dr. Lawrence Seifer, who performed a consultative psychological evaluation.[3]

---

[3] Plaintiff's appeal focuses on his neck and back pain, and does not challenge the ALJ's findings related to any mental impairments or limitations.

8

(Id. at 395-97.) Plaintiff reported back pain, anxiety, depression, insomnia, and weight loss, as well as physical and sexual abuse as a child. He has a history of alcohol and substance abuse but has been sober for more than 24 years. He explained that he shops, attends church, can use public transportation, but rarely does housework because of his inability to bend. He did, however, prepare meals and read. Dr. Seifer observed that Plaintiff's gait and posture were normal and Plaintiff had driven himself to the appointment. Dr. Seifer also noted that Plaintiff's thought processes were logical, relevant, coherent, and goal-directed; his concentration was impaired but his attention was "very good"; and he had intact judgment. Dr. Seifer diagnosed Plaintiff with adjustment disorder, panic disorder, and pain disorder, and noted his back problems.

Plaintiff also underwent a medical examination with Dr. Magy Dawoud. (Id. at 399-401.) Plaintiff complained of chronic low back pain with occasional radiculopathy, stiffening and difficulty straightening about twice/week, and intermittent neck pain. Dr. Dawoud observed that Plaintiff was well-developed, well-appearing, and walked without a limp. He had a decreased range of motion in the lower back and hips, but full range of motion in the neck and 5/5 strength in all muscle groups. He also had a negative Rhomberg; normal balance testing; intact

sensation; nontender back and neck; and no redness, swelling,
tenderness, or instability in the joints. Dr. Dawoud recommended
that Plaintiff consult with his treating physician regarding
pain control, and noted that Plaintiff's limited range of motion
could be improved with physical therapy.

Shortly thereafter, in May 2011, Plaintiff saw Dr. Ocasio,
at which time he denied any musculoskeletal symptoms. (Id. at
409.) The physical examination was normal, and Dr. Ocasio noted
that Plaintiff appeared well-developed and comfortable. (Id.)

In August 2011, Plaintiff followed-up with Dr. Whiting, who
noted that Plaintiff's coordination, motor power, sensation, and
reflexes were normal. (Id. at 439.) Later that month, however,
Dr. Whiting referred Plaintiff to physical therapy for his back
pain. (Id. at 444.) After 12 treatments between August 30, 2011
and December 9, 2011, the physical therapist discharged
Plaintiff, noting that the functional goals were partially met.
Plaintiff had some increase in strength but no change in ability
to function or pain level and Plaintiff complained that physical
therapy provided only temporary benefits. (Id.)

He sought no further treatment until June 2012 when he
presented to Virtua Family Health Center for hypertension. (Id.
at 453-55.) At that time, Plaintiff complained of a recent
increase in back pain, which was worsened by sitting and going
up and down stairs. However, the treatment records describe his

10

pain as only "moderate" with motion and a 6/10. X-rays were ordered and muscle relaxers as well as hypertension medication were prescribed. Plaintiff returned to Virtua for a follow-up on July 3, 2012. He again presented with "moderate" back pain for which he took motrin and flexeril at night, which helped "a little." (Id. at 537.)

Despite this recent complaint of increasing pain, Plaintiff did not seek further treatment until November 2012, when he returned to his chiropractor, Dr. Benn, for the first time since February 2009, prior to the alleged disability onset date. (Id. at 535.) Plaintiff informed Dr. Benn that he had been in a second motor vehicle accident a few days prior, which led to an increase in pain. (Id. at 531.) Plaintiff indicated that, prior to this second accident, he was "completely asymptomatic." (Id.) Throughout November 2012, Plaintiff consistently reported to Dr. Benn that his pain was 9-10/10, but that he experienced an overall decrease in symptoms and increase in spinal motion following each treatment. (See id. at 521-35.) For example, on November 15, 2012, Plaintiff informed Dr. Benn that he continued "to experience an[] overall decrease in their [sic] symptoms directly related to their [sic] trauma." (Id. at 524.) Despite this apparent improvement, Dr. Benn wrote that day a generalized letter, stating:

> Mr. Carlos Roque was injured in 2008. He became
> disable [sic] in 2009 with serve [sic] neck and back
> pain and unable to work from 2009 to present. He was
> involved in MVA on 10/30/2012 which further aggrevated
> [sic] his preious [sic] symptoms, aggrevated [sic] his
> cervical & lumbar which he is still unable to work.

(Id. at 459.) At the time Dr. Benn authored this note, he had

only been treating Plaintiff for two weeks and had not seen him

since nearly eight months prior to the alleged disability onset

date. Plaintiff continued to report severe pain but an overall

improvement. Indeed, a few days later, Dr. Benn noted that

Plaintiff indicated "overall improvement" and, specifically, a

decrease in subjective complaints as well as an increase in

cervical and thoraco-lumbar range of motion accompanied by a

decrease in pain and tenderness. (Id. at 521.)

     At the end of November, Dr. Benn ordered lumbar and

cervical spine MRIs that showed an L2-3 herniation encroaching

on the left L2 nerve root; L4-5 degenerative changes with left

L4 nerve root encroachment; an L5-S1 herniation; cervical spine

straightening suggestive of muscle spasm; C2 through C7 annular

bulging; a C4-5 shallow herniation; and a C5-6 herniation

impinging on the thecal sac and anterior cord. (Id. at 543-46.)

### d. **Plaintiff's Testimony**

     At the December 12, 2012 hearing, Plaintiff testified that

he is "very limited" and has difficulty with personal care

activities such as bathing and dressing. (R. 64.) He reports

12

pain to the point of tears in his back, and that it radiates down his legs causing tingling all the time. (Id.) Plaintiff testified that he can lift 5 to 8 pounds at most, is able to sit or stand for 20 to 25 minutes at a time, and can only walk about a half a block before resting. He is unable to bend, stoop, squat, or kneel. (Id. at 74.) He lives in a two-story home and sometimes needs assistance going up and down the stairs. (Id. at 76.) Plaintiff also testified that he has difficulty concentrating for more than 15 minutes because his mind wanders, and he has difficulty remembering things. (Id. at 75.)

According to Plaintiff, however, he socializes with friends, attends church every week, and prepares his own meals but does not do any chores or laundry. (Id. at 78, 80.) He further testified that while he goes shopping, someone else assists him with carrying the bags. (Id. at 78-79.) After the alleged disability onset date but prior to a second motor vehicle accident in October 2012, Plaintiff drove a car approximately four times per week to the supermarket. (Id. at 52.) Since the second accident, he does not drive very often. (Id. at 51.) Although he takes medication (ibuprofen, motrin, and tramadol), Plaintiff claims it merely numbs the pain. (Id. at 65.) Sometimes Plaintiff uses a cane (id. at 70), takes hot showers or uses Bengay, ice, or heat to help with the pain (id. at 71). At the time of the hearing, he was engaging in

13

chiropractic and acupuncture therapy. (Id. at 66.) Plaintiff also testified that while surgery has been recommended, he has not pursued that option because he is afraid of the anesthesia. (Id. at 68.)

Plaintiff acknowledged that he received unemployment benefits from 2009 until approximately June or July 2012. In order to receive those benefits, Plaintiff certified that he was ready, willing, and able to work despite his alleged severe limitations, and indeed Plaintiff testified that he looks for part-time work approximately three times a week. (Id. at 55, 57, 79.) Not only does he continue to look for work, but he also went on approximately 8 job interviews since the alleged disability onset date. (See id. 56.)

**e. The ALJ's Decision**

Applying the requisite five-step analysis, the ALJ concluded that Plaintiff met the insured status requirements of sections 216(i) and 223[4] of the Social Security Act through December 31, 2015, and that Plaintiff has not engaged in substantial gainful activity since the alleged disability onset

---

[4] Sections 216(i) and 223(d), of the Social Security Act define "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."

14

date, October 10, 2009. (R. 31.) The ALJ also found that
Plaintiff had severe impairments consisting of degenerative disc
disease, obesity, adjustment disorder with depressed mood, panic
disorder, and pain disorder. (Id.) The ALJ also addressed
Plaintiff's complaints of degenerative joint disease,
hypertension, hyperlipidemia, insomnia, and alcohol and
substance abuse, but found that these impairments do not cause
more than a minimal effect on the claimant's ability to do basic
work activities. (Id. at 31-32.)

The ALJ next determined that Plaintiff did not have an
impairment or combination of impairments that met or medically
equaled the severity of one of the listed impairments in 20
C.F.R. Part 404, Subpart P, App. 1. (Id. at 32.) Furthermore,
based on his findings, the ALJ determined that Plaintiff "had
the residual functional capacity to perform light work as
defined in 20 C.F.R. § 404.1567(b) except occasional pushing and
pulling with the lower extremities, occasional climbing of ramps
and stairs, no climbing of ladders, ropes and scaffolds,
occasional balancing, stooping, kneeling, crouching, and
crawling, should avoid concentrated exposure to wetness and
hazards such as unprotected heights and moving machinery, and
limited to unskilled work involving routine and repetitive
tasks." (Id. at 33.) The ALJ also stated that Plaintiff's
subjective complaints regarding the intensity, persistence, and

15

limiting effects of his alleged symptoms were not credible. (Id. at 34.) In making these determinations, the ALJ found "the objective medical findings, the claimant's wide range of activities of daily living, his receipt of unemployment insurance benefits, and his conservative treatment regimen support the residual functional capacity assessment []." (Id. at 35.)

After performing the RFC assessment, the ALJ determined that Plaintiff was unable to return to his past relevant work as a warehouse supervisor, which is skilled and light. (Id. at 35.) Furthermore, the ALJ concluded that, as of the alleged disability onset date, Plaintiff was a younger individual but that he had subsequently changed age category to closely approaching advanced age, had at least a high school education and was able to communicate in English. Then, considering Plaintiff's age, education, work experience, and RFC as determined, the ALJ found that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. (Id. at 35-36.) In particular, the ALJ relied upon the testimony of vocational expert, Lewis Solatzky, who testified that Plaintiff could perform certain jobs, including router (62,000 regional positions), information clerk (27,000 regional positions), surveillance system monitor (850 regional positions), and office helper (1,800 regional positions). (Id.

16

at 88-89.) Using the medical-vocational rules as a framework,
the ALJ found that Plaintiff was not disabled under Rules 202.14
and 202.21. (<u>Id.</u> at 36-37.)

## II.  **Standard of Review**

A reviewing court must uphold the Commissioner of Social
Security's factual findings if they are supported by
"substantial evidence," even if the court would have decided the
inquiry differently. 42 U.S.C. §§ 405(g), 1383(c)(3); <u>Knepp v.
Apfel</u>, 204 F.3d 78, 83 (3d Cir. 2000); <u>Fargnoli v. Massanari</u>,
247 F.3d 34, 38 (3d Cir. 2001). "Substantial evidence" means
"'more than a mere scintilla. It means such relevant evidence as
a reasonable mind might accept as adequate to support a
conclusion.'" <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)
(quoting <u>Cons. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938));
<u>Plummer v. Apfel</u>, 186 F.3d 422, 427 (3d Cir. 1999). Where the
evidence is susceptible to "more than one rational
interpretation, the Commissioner's conclusion must be upheld."
<u>Ahearn v. Comm'r</u>, 165 F. App'x 212, 215 (3d Cir. 2006) (citing
<u>Daring v. Heckler</u>, 727 F.2d 64, 70 (3d Cir. 1984); <u>Monsour Med.
Ctr. v. Heckler</u>, 806 F.2d 1185, 1190-91 (3d Cir. 1986)).

If faced with conflicting evidence, however, the
Commissioner "must adequately explain in the record his reason
for rejecting or discrediting competent evidence." <u>Ogden v.</u>

Bowen, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing Brewster v.

Heckler, 786 F.2d 581 (3d Cir. 1986)). Stated differently,

> [U]nless the [Commissioner] has analyzed all evidence
> and has sufficiently explained the weight he has given
> to obviously probative exhibits, to say that his
> decision is supported by evidence approaches an
> abdication of the court's duty to scrutinize the
> record as a whole to determine whether the conclusions
> reached are rational.

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978) (quoting

Arnold v. Sec'y of Health, Ed. & Welfare, 567 F.2d 258, 259 (4th

Cir. 1977)) (internal quotations omitted); see also Guerrero v.

Comm'r, No. 05-1709, 2006 WL 1722356, at *3 (D.N.J. June 19,

2006) ("The ALJ's responsibility is to analyze all the evidence

and to provide adequate explanations when disregarding portions

of it."), aff'd, 249 F. App'x 289 (3d Cir. 2007).

While the Commissioner's decision need not discuss "every

tidbit of evidence included in the record," Hur v. Barnhart, 94

F. App'x 130, 133 (3d Cir. 2004), it must consider all pertinent

medical and non-medical evidence and "explain [any]

conciliations and rejections," Burnett v. Comm'r, 220 F.3d 112,

122 (3d Cir. 2000). See also Fargnoli, 247 F.3d at 42 ("Although

we do not expect the [administrative law judge] to make

reference to every relevant treatment note in a case where the

claimant . . . has voluminous medical records, we do expect the

ALJ, as the factfinder, to consider and evaluate the medical

evidence in the record consistent with his responsibilities under the regulations and case law.").

In addition to the "substantial evidence" inquiry, the reviewing court must also determine whether the ALJ applied the correct legal standards. See Friedberg v. Schweiker, 721 F.2d 445, 447 (3d Cir. 1983); Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000). The court's review of legal issues is plenary. Sykes, 228 F.3d at 262 (citing Schaudeck v. Comm'r, 181 F.3d 429, 431 (3d Cir. 1999)).

### "Disability" Defined

The Social Security Act defines "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The Act further states,

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

19

The Commissioner has promulgated a five-step, sequential analysis for evaluating a claimant's disability, as outlined in 20 C.F.R. § 404.1520(a)(4)(i-v). In Plummer, 186 F.3d at 428, the Third Circuit described the Commissioner's inquiry at each step of this analysis:

> In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. § 1520(a). If a claimant is found to be engaged in substantial activity, the disability claim will be denied. Bowen v. Yuckert, 482 U.S. 137, 140 (1987).
>
> In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. 20 C.F.R. § 404.1520(c). If the claimant fails to show that [his] impairments are "severe," [he] is ineligible for disability benefits.
>
> In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.
>
> Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform [his] past relevant work. 20 C.F.R. § 404.1520(d). The claimant bears the burden of demonstrating an inability to return to [his] past relevant work. Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir. 1994). If the claimant is unable to resume [his] former occupation, the evaluation moves to the final step.
>
> At this [fifth] stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. 20 C.F.R. § 404.1520(f). The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent

with [his] medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether [he] is capable of performing work and is not disabled. See 20 C.F.R. § 404.1523. The ALJ will often seek the assistance of a vocational expert at this fifth step. See Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984).

## III. Analysis

Plaintiff makes several arguments on appeal, most of which challenge the ALJ's RFC finding. In particular, Plaintiff argues that the ALJ erred in (1) failing to assess limitations due to Plaintiff's obesity; (2) improperly rejecting Dr. Benn's opinion that Plaintiff is "unable to work"; (3) finding Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms not entirely credible; and (4) relying on the vocational expert's testimony that Plaintiff could perform certain jobs and that those jobs exist in significant numbers in the national economy. In addition, Plaintiff argues that it was error for the Appeals Council to refuse to consider evidence consisting of a September 2013 initial examination by Dr. Allan Weissman and an abnormal electrodiagnostic study dated September 30, 2013. (R. 8-18.)

### a. Failure to Assess Limitations Due to Obesity

Plaintiff first contends that the ALJ erred in failing to assess limitations associated with Plaintiff's obesity, which the ALJ found to be a severe impairment. (See R. 31.) SSR 02-1p

21

recognizes that "[o]besity can cause limitation of function" in exertional or postural areas, or may affect the ability to manipulate with hands and finger. SSR 02-1p also requires the ALJ to consider a claimant's obesity at Steps Two through Five of the disability analysis.

In assessing Plaintiff's obesity, the ALJ noted that at the time of his application, Plaintiff was 5'7" and weighed 213 pounds, resulting in a BMI of 33.4. (R. 32 (Step Two).) Later in the Opinion, the ALJ cited medical evidence reflecting a BMI of 37-38 at other times during the relevant period. (Id. at 34 (Step Four).) The ALJ further noted that the "claimant's condition was considered using the criteria of the musculoskeletal, respiratory, and cardiovascular impairments under Listings 1.00(Q), 3.00(I), and 4.00(F), respectively," and cited SSR 02-1p. (Id. at 32.) He concluded, however, that "there is no indication the claimant's obesity, alone or in combination with any other impairment, has given rise to a condition of listing-level severity." (Id. (Step Three).) Moreover, throughout the opinion, the ALJ provided an extensive discussion of Plaintiff's subjective complaints, as well as the medical evidence, and opinion evidence. It is clear from his opinion that he considered SSR 02-1p and recognized the medical evidence demonstrating Plaintiff's obesity at each step in his analysis. (See, e.g., id. 31 (Step 2), 32 (Step 3).) While he did not

22

specifically identify any musculoskeletal or other limitations associated with Plaintiff's obesity, the ALJ did assess musculoskeletal limitations due to Plaintiff's other impairments (specifically, his back and neck pain) based upon his review of the evidence. The Court finds that the ALJ has properly considered Plaintiff's obesity at each step of his analysis in accordance with SSR 02-1p, and that the ALJ's determination that Plaintiff's obesity does not require additional limitations is supported by substantial evidence.[5]

Although several doctors observed that Plaintiff is obese, none cite any difficulties or limitations associated with that condition. In fact, the medical evidence consistently refers to Plaintiff's normal gait and ability to ambulate without assistance. (See, e.g., R. 370, 377, 381, 384, 389, 400, 439.) Dr. Ocasio even refers to Plaintiff as "[w]ell developed" with

---

[5] Plaintiff argues unpersuasively that the ALJ's conclusion at Step Two that Plaintiff's obesity constitutes a severe impairment is incompatible with his failure to assess additional limitations at Step Four. The determination at Step Two merely acknowledges that Plaintiff's obesity is more than a "slight abnormality" and has more than a minimal impact on Plaintiff's ability to perform basic work activities. See Rosa v. Comm'r of Soc. Sec., No. 12-5176, 2013 WL 5322711, at *3 n.5 (D.N.J. Sept. 20, 2013). Such a conclusion does not necessarily mean that the ALJ need have assessed more extensive limitations than those he did find. Cf. Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 546 (3d Cir. 2003) ("The step-two inquiry is a de minimis screening device to dispose of groundless claims."). This is especially true where, as here, the record does not support such limitations.

"normal muscle tone and bulk". (Id. at 400, 418.) Moreover, Plaintiff himself did not allege a disability based upon his obesity when he filed his application, nor has he identified any additional limitations that the ALJ should have included due to Plaintiff's obesity.[6] (See id. at 226.) Cf. Herron v. Comm'r of Soc. Sec., 386 F. App'x 68, 71 (3d Cir. 2010) ("Although Herron is obese, there is substantial evidence that she could perform all activities of daily living and could drive and care for her children during this time."); Martin v. Comm'r of Soc. Sec., 369 F. App'x 411, 414-15 (3d Cir. 2010) (finding that ALJ properly considered SSR 02-1p and that ALJ's determination that, because plaintiff ambulated effectively, her obesity did not meet or equal any listing was supported by substantial evidence); Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005) (finding remand not required where plaintiff never mentioned obesity as contributing to her inability to work or specified how her obesity would impact the ALJ's analysis other than a generalized assertion that it is more difficult for her to stand, walk, and manipulate her hands and fingers). As such, the ALJ did not err in declining to assess any limitations related to Plaintiff's obesity.

---

[6] At most, Plaintiff asserts that he is 70 pounds overweight and has a back disease, which "is certainly more than a minimal limitation." (Pl.'s Br. 17.)

24

### b. <u>Treatment of Dr. Benn's Opinion</u>

Plaintiff next argues that the ALJ erred in rejecting the opinion of Plaintiff's treating chiropractor, Dr. Benn, which constitutes the only treating source opinion in the record. According to the record, Dr. Benn treated Plaintiff from June 25, 2008 to February 24, 2009, and again from November 1, 2012 to at least November 21, 2012. On November 15, 2012, despite having treated Plaintiff for only two weeks at that time, Dr. Benn opined that Plaintiff "became disable[d] in 2009" and "unable to work from 2009 to present." (R. 459.) The ALJ gave this opinion "little weight," explaining that it was provided by an unlicensed physician, which is not an "acceptable medical source" under 20 C.F.R. § 404.1513. In addition, the ALJ noted that the opinion was on an issue reserved to the Commissioner and was inconsistent with the medical evidence. These conclusions are supported by substantial evidence.

A chiropractor's opinion is not entitled to controlling weight as a chiropractor is not "an acceptable medical source" under 20 C.F.R. § 404.1513. <u>See, e.g.</u>, <u>Hartranft v. Apfel</u>, 181 F.3d 358, 361 (3d Cir. 1999). As such, Dr. Benn's opinion is not a "medical opinion." <u>See</u> 20 C.F.R. § 404.1527(a)(2) ("Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your

25

symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."). The ALJ may still consider the chiropractor's opinion, along with other evidence of disability. See Hartranft, 181 F.3d at 361.

Here, however, as the ALJ properly noted, Dr. Benn's opinion fails to assess any functional limitations and merely asserts that Plaintiff is, and has been since 2009, "disabled" and "unable to work". Such opinions are on issues reserved to the Commissioner. See 20 C.F.R. § 404.1527(d)(1) ("Opinions on some issues, such as the examples that follow, are not medical opinions, as described in paragraph (a)(2) of this section, but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability. (1) Opinions that you are disabled. . . . A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."). "While the ALJ must consider all of the evidence and various influencing factors in making an RFC determination, the final responsibility for deciding this issue is reserved to the Commissioner; the ALJ is not required to 'give any special significance to the source of an opinion on issues reserved to the Commissioner . . . .'" Buckley v. Astrue, No. 09-5058, 2010 WL 3035746, at *9 (D.N.J. Aug. 3, 2010) (quoting 20 C.F.R.

26

§ 404.1527(e)(2)-(3)). Thus, the ALJ need not have considered Dr. Benn's conclusory opinion as to Plaintiff's ability to work.

Dr. Benn's opinion is also inconsistent with the record, as the ALJ concluded. For example, Plaintiff worked up until the alleged disability onset date, when he only ceased working because he was laid off after the company decided to relocate. (See R. 59-60.) Additionally, Plaintiff received unemployment benefits up until a few months prior to the hearing and continued to look for work even at the time of the hearing. (See, e.g., id. at 34-35, 56.) Interestingly, Dr. Benn opined that Plaintiff has been disabled since 2009 but Dr. Benn did not even treat Plaintiff from March 2009 (prior to the alleged disability onset date) through October 2012 (a few months before the ALJ's January 2013 decision); in other words, Dr. Benn did not treat Plaintiff for nearly the entire period of time during which he opines that Plaintiff was unable to work. And, while not cited by the ALJ, on the day Dr. Benn opined that Plaintiff was disabled, he reported that Plaintiff "continue[s] to experience an[] overall decrease in their [sic] symptoms." (Id. at 524.) Moreover, he opined that the second motor vehicle accident had exacerbated Plaintiff's symptoms yet his treatment notes record that Plaintiff was asymptomatic prior to the accident. Accordingly, the Court finds substantial evidence

27

supports the ALJ's decision to afford little weight to Dr.
Benn's opinion.[7]

### c. **Plaintiff's Credibility**

Plaintiff also challenges the ALJ's finding that
Plaintiff's statements concerning the intensity, persistence and
limiting effects of these symptoms are not entirely credible.
(See R. 34.) While the ALJ is permitted to find portions of
Plaintiff's testimony not credible, he is required to provide
reasons for rejecting portions of Plaintiff's testimony which
conflict with his findings. See Burnett, 220 F.3d at 122
(stating an ALJ must consider all pertinent medical and non-
medical evidence and "explain [any] conciliations and
rejections"). In addition, it is insufficient for an ALJ to make
a conclusory statement regarding a Plaintiff's credibility. See
SSR 96-7P. Instead, the ALJ must provide "specific reasons for
the finding on credibility, supported by the evidence in the

---

[7] Plaintiff cites to Schonewolf v. Callahan, 972 F. Supp.
277, 286 (D.N.J. 1997), as holding it is error to reject a
treating chiropractor's opinion in the absence of contrary
evidence. (See Pl.'s Br. at 19.) There, however, the Court found
that the ALJ failed to adequately explain why he did not give
more weight to the medical evidence of the chiropractor, which
was consistent with all of the other medical and opinion
evidence. Here, however, the ALJ sufficiently explained his
reasons for affording little weight to Dr. Benn's opinion.
Moreover, the chiropractor's opinion in Schonewolf, unlike Dr.
Benn's opinion, provided an analysis of the plaintiff's
functional capabilities.

case record[.]" 20 C.F.R. § 404.1545(a)(1). "Where medical
evidence does support a claimant's complaints of pain, the
complaints should then be given 'great weight' and may not be
disregarded unless there exists contrary medical evidence."
Mason v. Shalala, 994 F.2d 1067–68 (3d Cir. 1993) (citations
omitted). However, as the fact finder, the ALJ can "reject
partially, or even entirely, such subjective complains if they
are not fully credible." Weber v. Massanari, 156 F. Supp. 2d
475, 485 (E.D. Pa. 2001) (citation omitted). Nonetheless, the
ALJ "must give some indication of the evidence that he rejects
and his reason(s) for discounting that evidence." Fargnoli, 247
F.3d at 43.

Plaintiff argues that the ALJ failed to specifically and
explicitly explain the connection between the medical evidence
and Plaintiff's statements, such that he has failed to provide a
rationale for his credibility determination. "When an ALJ
rejects potentially persuasive evidence, 'the ALJ is not
required to supply a comprehensive explanation . . . ; in most
cases, a sentence or short paragraph would probably suffice.'
The ALJs findings must sufficiently develop the record to allow
for judicial review." Bailey v. Comm'r of Soc. Sec., 354 F.
App'x 613, 617 (3d Cir. 2009) (quoting Cotter v. Harris, 650
F.2d 481, 482 (3d Cir. 1981)).

The ALJ set forth Plaintiff's allegations and testimony
that he is disabled due to lower back pain that radiates to his
legs, which is aggravated by bending, sitting, walking, and damp
weather. (R. 34.) He also described the medical evidence showing
diagnoses of radiculopathy, disc herniations, and disc bulging.
(Id.) The ALJ described Plaintiff's conservative treatment
regimen, which included chiropractic treatment and physical
therapy in 2008 and 2009, and injections in 2009 and 2010. (Id.
at 34-35.) The ALJ also noted that, despite recommendations as
far back as June 2010 that Plaintiff receive surgery, Plaintiff
declined to do so as he was afraid of the anesthesia. (See id.)
The record also reflects that other alternative treatments were
discussed with Plaintiff and/or recommended by treating sources,
but Plaintiff declined to engage in them. (See, e.g., 390, 444.)
The ALJ further pointed out that several medical records
indicate normal balance and reflex testing, 5/5 muscle strength,
normal gait, ambulation without assistance, and only moderate
pain with motion. (Id.) Furthermore, the physical therapy and
chiropractic records indicated overall improvement. (Id.) The
ALJ concluded that Plaintiff was capable of performing unskilled
light work with some postural limitations and only occasional
pushing and pulling with his lower extremities. He explained
that this RFC was supported by the objective medical findings,
Plaintiff's wide range of activities, receipt of unemployment

benefits, and conservative treatment. From this discussion, it is apparent that the ALJ found Plaintiff's statements "not entirely credible" for these same reasons. Thus, "[b]y evaluating the extent to which Plaintiff's subjective complaints were reasonably consistent with the objective medical evidence, the credibility analysis was proper." See Thompson v. Colvin, No. 13-1311, 2015 WL 1198103, at *23 (M.D. Pa. March 16, 2015) (citing Blue Ridge Erectors v. Occupational Safety & Health Review Comm'n, 261 F. App'x 408, 410 (3d Cir. 2008)); see also St. George Warehouse, Inc. v. NLRB, 420 F.3d 294, 298 (3d Cir. 2005) ("[T]he ALJ's credibility determinations should not be reversed unless inherently incredible or patently unreasonable.")).

The ALJ's credibility determination is supported by substantial evidence consisting of the objective medical findings, Plaintiff's activities, and his receipt of unemployment benefits. As Plaintiff notes in his memorandum, Plaintiff testified that his back and neck problems "restricted his functional capacity due to physical restrictions and pain to an extent he would not have been capable of even sedentary work activity on a sustained basis." (Pl.'s Br. at 19 (citing R. 64).) However, in contradiction, he also testified that he had worked up until the alleged disability onset date and ceased working because his employer laid him off after it decided to

31

relocate out-of-state; he received unemployment compensation for
which he certified that he was "ready, willing, and able to
work"; and he continued to look for work even up until the
hearing date, which certainly contradicts his assertions that he
is unable to work at all. (See R. 55, 79.) Contrary to
Plaintiff's argument, "[i]t is entirely proper for the ALJ to
consider a claimant's receipt of unemployment compensation
benefits as inconsistent with a claim of disability during the
same period." See Meyers v. Barnhart, 57 F. App'x 990, 991 (3d
Cir. 2003).[8]

As the ALJ reasoned, Plaintiff's allegations are also
inconsistent with the activities he reported engaging in
throughout the relevant period. As previously noted, he worked
up until the day before he purportedly became completely
disabled. In his adult function report completed on March 7,
2011 and discussed by the ALJ, Plaintiff reported that he
prepares meals daily, irons, does laundry, cleans, drives a car,
and shops. (See id. at 34 (citing id. at 208-10).) The following
month, Plaintiff informed Dr. Seifer that he shops, attends
church, can use public transportation, but rarely does housework

---

[8] At the hearing, Plaintiff acknowledged the ALJ's ability
to account for the receipt of unemployment compensation in
evaluating credibility (see R. 101 ("The fact that he collected
unemployment is a fact to be considered with regard to his
credibility.")), but has since changed course.

because of his inability to bend. However, he also prepares meals and reads. (Id. at 395-97.)

What gives this Court pause, however, is the ALJ's apparent reliance on Plaintiff's "conservative treatment regimen" and his reference to Plaintiff's refusal to undergo surgery despite multiple recommendations that he do so. In assessing Plaintiff's credibility, the ALJ may properly rely upon Plaintiff's course of treatment. The ALJ, however,  but "must not draw any inferences about [Plaintiff's] symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that [Plaintiff] may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." See SSR 96-7p; see also Thennion v. Colvin, No. 13-00268, 2015 WL 877784, at * 24 (M.D. Pa. March 2, 2015). It is unclear from the ALJ's opinion whether Plaintiff's failure to undergo surgery or other treatment is even what is meant by the ALJ's reference to Plaintiff's "conservative treatment regimen."[9] Moreover, the ALJ's opinion does not clearly indicate what weight he gave Plaintiff's failure to undergo surgery or his purported explanation for such

---

[9] In fact, the evidence demonstrates Plaintiff's refusal to pursue other, less intrusive treatment recommendations but this evidence is not cited by the ALJ (see, e.g., 289, 399-401, 444).

33

failure, which he must consider. Certainly, the ALJ may have properly concluded that Plaintiff declined surgery, not because he feared the side effects of the anesthesia as he claimed, but because his symptoms were not severe enough to necessitate such treatment. See SSR 96-7p (noting that explanations for failure to pursue certain treatments may bear on credibility and, for example, may indicate that symptoms are not severe enough to prompt the plaintiff to seek treatment); Garrett v. Comm'r of Soc. Sec., 274 F. App'x 159, 164 (3d Cir. 2008) (affirming where "The ALJ noted that the conservative treatment Garrett received for her impairments indicated that they were not as debilitating as she claimed. The ALJ also discounted Garrett's claims of disability by noting that she was never hospitalized for her conditions, and could perform household chores and activities of daily living. The ALJ also remarked that, while Garrett claims constant excruciating head, neck, and back pain, she only takes Advil or Excedrin."); see also Thompson v. Colvin, No. 13-2605, 2015 WL 915484, at *17 (M.D. Pa. March 3, 2015) ("Before drawing an adverse inference from a claimant's refusal to undergo recommended surgery, the ALJ must consider any explanations that a claimant may provide, or other information in the case record, which may explain a claimant's refusal to undergo surgery. In this instance, the ALJ did not consider any explanation for why Plaintiff declined surgery." (citations omitted)).

It appears from the ALJ's thorough analysis of the medical evidence that he considered Plaintiff's decision not to undergo surgery, in conjunction with Plaintiff's failure to pursue other alternative treatment options, or even consistent treatment, as evidence contradicting Plaintiff's subjective complaints regarding the extent of his limitations. The objective medical evidence demonstrates that, although Plaintiff has complained of pain since his first motor vehicle accident in June 2008, he did not pursue treatment for a significant period of time during the relevant period and, when he did receive treatment, he consistently reported improvement in his daily activities and decreased pain. For example, Plaintiff began treating with Dr. Benn in June 2008 and reported improvements in his activities until February 2009 when he ceased his chiropractic treatments. (R. 510.) He continued to receive treatment through the pain center until June 2010, when it was recommended that he undergo surgery or other alternative treatments, which he declined. (Id. at 289.) He also received epidural injections during this time, which resulted in 50-60% improvement according to Dr. Sheikh's notes. From June 2010 through late April 2011, however, the medical record shows neither treatment nor complaints of back and neck pain. Indeed, the medical record appears devoid of any such references until late April and May 2011 when Plaintiff complained of lumbosacral pain radiating in his legs. (See,

35

e.g., id. at 440.) However, Dr. Seifer observed during
Plaintiff's appointment that Plaintiff's gait and posture were
normal and Plaintiff had driven himself to the appointment. (Id.
at 395-97.) Similarly, Dr. Dawoud observed that Plaintiff walked
without a limp, had a decreased range of motion in the lower
back and hips but full range of motion in the neck, 5/5 strength
in all muscle groups, normal balance and sensation, and a
nontender back and neck. (Id. at 399-401.) Despite his
complaints of pain around this time, Plaintiff sought no further
treatment until commencing physical therapy in August 2011 —
more than a year after ceasing his prior treatment regimen. (See
id. at 439-44.) At that time, Dr. Whiting noted that Plaintiff's
coordination, motor power, sensation, and reflexes were normal.
(Id. at 444.)

He continued physical therapy until December 2012, when he
was discharged with a notation that his goals were partially
met. (Id. at 444.) Plaintiff points out that the physical
therapist's notes show that Plaintiff reported decreased
functionality and increased pain at discharge. The therapist's
notes, however, also show Plaintiff experienced an increase in
strength and motion, and at least temporary benefits from
therapy. (Id.) The therapist further recommended that he discuss
alternative pain treatments with his physician, but the medical
record contains no evidence that he did so. In fact, the record

36

contains no reports of pain or treatment for the next six months, until he presented to Virtua Family Health Center in June 2012 for his hypertension and complained of recently-increased, "moderate" pain with motion. (See id. at 453-55.) After that, he did not obtain treatment until he returned to Dr. Benn in November 2012. (See id. at 521-35.) At that time, Plaintiff informed Dr. Benn that he had been "completely asymptomatic" prior to a second motor vehicle accident that occurred on October 30, 2012. (Id.) Once again, Plaintiff reported improvement through his chiropractic treatment, including improvement on the day Dr. Benn drafted a letter opining that Plaintiff has been completely disabled since 2009.

In short, while the objective medical evidence (much of which was cited by the ALJ) does appear to contradict Plaintiff's subjective complaints regarding the extent of his limitations (as set forth above), it is unclear from the ALJ's opinion to what extent he relied upon or considered Plaintiff's decision not to undergo surgery and his reasons for refusing this recommended treatment in evaluating Plaintiff's credibility. For this reason, the Court remands the matter to the ALJ for further explanation of his credibility determination.

### d. Acceptance of Vocational Expert's Testimony

Plaintiff next argues that the ALJ erred in relying on the vocational expert's testimony and, thus, the ALJ's conclusion at Step Five that there were a significant number of jobs in the national economy that Plaintiff could perform was not supported by substantial evidence.[10] As set forth above, the vocational expert testified that there were four occupations that Plaintiff could perform with the RFC assessed by the ALJ: router (62,000 regional positions), information clerk (27,000 regional positions), surveillance system monitor (850 regional positions), and office helper (1,800 regional positions). Upon further questioning by Plaintiff's counsel, the vocational expert acknowledged that these figures were somewhat overstated as they accounted for occupations with greater skill levels.[11] For example, the vocational expert acknowledged that a router encompassed approximately 73 related occupations, only 10 of which were unskilled and thus within Plaintiff's RFC. He further

---

[10] Plaintiff's first contention that the ALJ posed an incomplete hypothetical to the vocational expert is based upon his argument that the ALJ failed to incorporate limitations related to Plaintiff's obesity. (See Pl.'s Br. at 28.) As set forth above, that argument has no merit and, thus, the Court rejects this contention.

[11] Plaintiff challenges the ALJ's opinion in part because the ALJ cited the "overstated" numbers as representative of the number of positions available. The Court finds that this error is harmless in light of the fact that the correct lower number still represents a significant number of available positions in the national economy.

testified that this was true of the other positions he had
identified. (R. 94-95.) The expert clarified, however, that "the
numbers would still be large numbers" and "given the population
of the region, it would be – that number would, in [the
vocational expert's] estimate, would be at least 1,000 or
greater." (Id. at 95-97.) Notably, this 1,000 or more figure
refers to only one of the four general positions that the
vocational expert identified as positions Plaintiff could
perform. (See id. at 98; 99 ("Q. [] So the six – it's not
62,000, it's maybe 1,000? A. Correct.").) The Third Circuit has
held that as few as 200 jobs in the regional economy was
sufficient. Ahmad v. Commissioner of Social Sec., 531 F. App'x
275, 278 (3d Cir. 2013) ("In light of our determination in
Craigie v. Bowen, 835 F.2d 56, 58 (3d Cir. 1987), that 200 jobs
in the regional economy was a 'clear indication' that other
meaningful work in the national economy existed, we conclude
that the ALJ did not err by concluding that the 569 jobs
available as a surveillance system monitor was evidence of other
work in significant numbers in the national economy."); 20
C.F.R. §§ 416.960(c)(1), 416.966(a) (noting that other work that
could be performed must exist in significant numbers in the
national economy). The ALJ was entitled to rely upon the
testimony of the vocational expert who identified at least one
position, router, with at least 1,000 regional positions

39

available and, as such, substantial evidence supports the ALJ's conclusion at Step Five. See, e.g., Kuczewski v. Comm'r of Soc. Sec., 2013 WL 1007684, at *4 (D.N.J. March 12, 2013) (citing cases); Thomas v. Chater, 933 F. Supp. 1271, 1279 (D. V.I. 1996) ("The testimony of a vocational expert constitutes substantial evidence for purposes of an ALJ's decision. Here, the expert indicated that 1,500 jobs within plaintiff's capacities exist in the Caribbean region. No more is required." (internal citations omitted)).

### e. Appeals Council's Rejection of New Evidence

Finally, Plaintiff contends that it was error for the Appeals Council to reject the September 2013 initial examination and electrodiagnostic study as relating to a "later time." (See R. 2.) The Court disagrees. The regulations permit remand for consideration of new evidence only where it is (1) new, (2) material, and (3) there is good cause for the failure to incorporate this evidence in the record. Evidence that is merely cumulative does not constitute new evidence. Gilroy v. Astrue, 351 F. App'x 714, 717 (3d Cir. 2009). Moreover, "new evidence will be 'material' in this context only if it 'relate[s] to the time period for which benefits were denied,' and does not concern 'the subsequent deterioration of the previously non-disabling condition.'" Lisnichy v. Comm'r of Soc. Sec., No. 14-3544, 2015 WL 151775, at *2 (3d Cir. Jan. 13, 2015) (quoting

Szubak v. Sec'y of Health & Human Servs., 745 F.2d 831, 833 (3d
Cir. 1984)). Here, the examination report and nerve study were
created in September 2013, and incorporate observations and
study results as of that time. Although the two doctors
concluded that Plaintiff's conditions in September 2013 could
likely be traced to the October 2012 motor vehicle accident,
there is nothing in the reports that can be viewed as supporting
the conclusion that Plaintiff's conditions were disabling prior
to the date of the ALJ's decision. Indeed, neither of these
doctors had examined Plaintiff prior to September 2013 – nine
months after the ALJ's decision. Thus, the Court cannot conclude
that it was error for the Appeals Council to refuse to change
the ALJ's decision on the basis of Plaintiff's new evidence.

The Court further notes that the evidence must be new and
not merely cumulative of the evidence in the record before the
ALJ. Plaintiff's purportedly new evidence discusses Plaintiff's
subjective complaints of pain, of which the record is replete,
and signs of radiculopathy, which Plaintiff concedes are present
in other portions of the record. (See Pl.'s Br. at 25.) In
Plaintiff's own words, these new records at best merely
"confirmed" the diagnoses and complaints in the record. (See
Pl.'s Br. at 25.) As such, they are insufficient to necessitate
remand.

41

The Court also rejects Plaintiff's argument that he should be found disabled as of the alleged disability onset date because, subsequent to the ALJ's decision, Plaintiff filed a new application and was found disabled as of January 12, 2013 – i.e., the day after the ALJ's decision - and "it defies logic to conclude that the onset of disability was really only as of that date." (See Pl.'s Br. at 26.) The Court rejects this argument. See Leyva v. Comm'r of Soc. Sec., 379 F. App'x 133, 135 n.2 (3d Cir. May 11, 2010) ("Leyva also takes issue with the fact that he was later deemed to be disabled as of March 31, 2006, one day after the ALJ issued his denial decision for the instant application. Leyva's subsequent disability application and adjudication, however, are not part of the administrative record and are, thus, outside the scope of our review.").

## IV.  Conclusion

For the reasons set forth above, the Court vacates the decision of the ALJ denying Plaintiff's disability benefits, and remands for further proceedings consistent with this Opinion.


                              s/Renée Marie Bumb
                              RENÉE MARIE BUMB
                              United States District Judge


Dated: May 13, 2015